David J. Jordan (1751)
*david.jordan@stoel.com*
Jordan Hilton (17506)
*jordan.hilton@stoel.com*
STOEL RIVES LLP
201 S. Main Street, Suite 1100
Salt Lake City, UT 84111
Telephone: (801) 328-3131

David M. Andersen (16352)
*david_andersen@byu.edu*
Madelyn L. Blanchard (16403)
*madelyn_blanchard@byu.edu*
BRIGHAM YOUNG UNIVERSITY
A-368 ASB
Provo, UT 84602
Telephone: (801) 422-6102

*Attorneys for Defendant*
  *Brigham Young University*

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| ASHTIN MARKOWSKI,<br><br>Plaintiff,<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY,<br><br>Defendant. | **MOTION FOR SUMMARY JUDGMENT**<br><br>Civil No. 2:20-cv-000872-JNP<br><br>The Honorable Jill N. Parrish<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND RELIEF REQUESTED....................................................1

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................3

    The Church's Missionary Program, Missionary Training Centers, and BYU ........................................................................................................3

    Ms. Markowski Works as an MTC Online Trainer at the MTC ..................5

    Ms. Markowski's EEOC Charge of Discrimination ...................................15

    Ms. Markowski's Title IX Lawsuit In Oregon ...........................................15

ARGUMENT ........................................................................................................16

    I.    The Ministerial Exception Applies to Title VII Claims....................17

    II.    The First Amendment Bars Ms. Markowski's Title VII Claims .......19

        A.    Ms. Markowski Performed "Vital Religious Duties"..............20

        B.    Ms. Markowski's Employment Satisfies Other Ministerial Factors ................................................................22

    III.    The Retaliation Claim Fails Because Ms. Markowski Did Not Allege Retaliation before the EEOC .................................................26

CONCLUSION.....................................................................................................27

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)................................................................................16

*E.E.O.C. v. Cath. Univ. of Am.*,
   83 F.3d 455 (D.C. Cir. 1996)..................................................................17

*Glapion v. Jewell*,
   673 F. App'x 803 (10th Cir. 2016).........................................................25

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*,
   565 U.S. 171 (2012)...........................................................................passim

*Jenkins v. Wood*,
   81 F.3d 988 (10th Cir. 1996) .................................................................16

*Martinez v. Potter*,
   347 F.3d 1208 (10th Cir. 2003) .............................................................25

*McDonald-Cuba v. Santa Fe Protective Servs., Inc.*,
   644 F.3d 1096 (10th Cir. 2011) .............................................................25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
   140 S. Ct. 2049 (2020)......................................................................passim

*Petruska v. Gannon Univ.*,
   462 F.3d 294 (3d Cir. 2006) ..................................................................17

*Skrzypczak v. Roman Catholic Diocese of Tulsa*,
   611 F.3d 1238 (10th Cir. 2010) ........................................17, 21, 22, 24

*Weigel v. Broad*,
   544 F.3d 1143 (10th Cir. 2008) .............................................................15

## Statutes

Civil Rights Act of 1964 §7, 42 U.S.C. §2000e *et seq* (1964) ........................passim

**Rules**

DUCivR 56-1 ...................................................................................................1

Fed. R. Civ. P. 56 ..........................................................................................1

Fed. R. Civ. P. 56(c)......................................................................................15

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................passim

110787855.1 0028507-00002

Pursuant to Fed. R. Civ. P. 56 and DUCivR 56-1, Defendant Brigham Young University ("BYU") moves for summary judgment on all claims asserted in Plaintiff's first amended complaint ("Complaint").

## INTRODUCTION AND RELIEF REQUESTED

Ashtin Markowski taught and trained missionaries and functioned as a missionary herself for The Church of Jesus Christ of Latter-day Saints (the "Church") at the Missionary Training Center in Provo, Utah ("MTC"). Ms. Markowski admits that she trained missionaries "in the handling of incoming online inquiries and traffic of persons interested in the Church" and trained missionaries "who were serving in the 'field.'" (Compl. ¶¶ 4, 6.) As an MTC employee, she also received referrals for and shared her beliefs online with those interested in the Church and its teachings.

Ms. Markowski executed employment documents where she agreed to "invite all to come unto Christ and help missionaries to effectively do the same"; "[t]each by the Spirit"; and help "both staff and missionaries in fulfilling their purpose" to "invite others to come unto Christ by helping them receive the restored gospel through faith in Jesus Christ and His Atonement, repentance, baptism, receiving the gift of the Holy Ghost, and enduring to the end." In short, Ms. Markowski's job—both training evangelists at the Church's equivalent of a theological seminary and as an evangelist herself for the Church—was "loaded with religious significance."

*Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2067 (2020). Under Supreme Court precedent, she easily qualifies as a "minister."

Despite the deeply religious nature of her position, Ms. Markowski now asserts that Title VII of the Civil Rights Act of 1964 proscribed BYU's termination of her employment at the MTC. But Title VII cannot apply here because "[b]oth Religion Clauses [of the First Amendment to the U.S. Constitution] bar the government from interfering with the decision of a religious group to fire one of its ministers." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 181 (2012). Indeed, "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2069. The Supreme Court in both *Hosanna-Tabor* and *Our Lady of Guadalupe* held that the First Amendment requires a "ministerial exception" that "foreclose[s] certain employment discrimination claims brought against religious organizations." *Id.* 140 S. Ct. at 2061 (citing *Hosanna-Tabor*, 565 U.S. at 188).

In sum, Ms. Markowski's employment discrimination claims fail as a matter of law because they are barred by the ministerial exception. Her retaliation claim also fails because she did not raise it with the EEOC. Accordingly, BYU requests that the Court enter summary judgment in its favor on all claims asserted in the Complaint.

2

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**The Church's Missionary Program, Missionary Training Centers, and BYU**

1.      The Church describes its missionary program as one of its "most recognized characteristics" and says that its "missionary effort is based on the New Testament pattern of missionaries serving in pairs, teaching the gospel and baptizing believers in the name of Jesus Christ." (*Missionary Program*, Newsroom of The Church of Jesus Christ of Latter-day Saints, https://newsroom.churchofjesus christ.org/topic/missionary-program, attached as **Exhibit A**.) [1]  "Most missionaries are young people under the age of 25." (*Id.*)

2.      "Prior to going to their assigned area, missionaries spend a short period of time at one of 10 missionary training centers throughout the world. There they learn how to teach the gospel in an orderly and clear way . . . ." (*Id.*)

3.      According to the Church, "MTCs provide a decidedly more rigorous curriculum rooted in gospel fundamentals. The meat and drink of MTC life is daily practice teaching situations, intense gospel classroom instruction from teachers who are former missionaries, weekly devotional addresses from Church leaders and MTC staff, and weekly service opportunities." (*Missionary Training Centers*, Newsroom of The Church of Jesus Christ of Latter-day Saints,

---

[1] All exhibits to this Motion are attached to the Declaration of David M. Andersen In Support Of Motion For Summary Judgment, executed April 30, 2021 and filed concurrently herewith.

https://newsroom.churchofjesuschrist.org/topic/missionary-training-centers,
attached as **Exhibit B**.)

4.      The Church states, "While MTC locations and languages differ, the
curriculum taught at each facility is the gospel of Jesus Christ as set forth in the
Bible and other scriptures." (*Preparation with Purpose: Life in a Mormon*
*Missionary Training Center*, Newsroom of The Church of Jesus Christ of Latter-
day Saints (Sept. 17, 2013), https://newsroom.churchofjesuschrist.org/article/
mormon-mtc-life, attached as **Exhibit C**.)

5.      *Preach My Gospel*, the standard handbook for all missionaries in the
Church, states that a missionary's purpose is to "[i]nvite others to come unto Christ
by helping them receive the restored gospel through faith in Jesus Christ and His
Atonement, repentance, baptism, receiving the gift of the Holy Ghost, and
enduring to the end." (*A Guide To Missionary Service: Preach My Gospel* 1
(2004), an excerpt of which is attached as **Exhibit D**.) In sum, missionaries have a
"commission to teach the restored gospel of Jesus Christ." (*Id.*)

6.      "The mission of Brigham Young University—founded, supported,
and guided by The Church of Jesus Christ of Latter-day Saints—is to assist
individuals in their quest for perfection and eternal life." BYU's mission statement
further states that "BYU can continue to expand its influence both by encouraging
programs that are central to the Church's purposes and by making its resources

4

available to the Church when called upon to do so." (*Mission of BYU*, BYU Undergraduate Catalog (Nov. 4, 1981), https://catalog.byu.edu/about-byu/mission-of-byu, attached as **Exhibit E**.)

7.     BYU provides operational support to the MTC on behalf of the Church and under its direction. BYU hires many MTC employees, including BYU students who teach and train full-time missionaries. (Compl. ¶ 4; *see also* MaryLynn Johnson, *For the Spirit of It: Student Workers at the MTC*, Y Magazine (Winter 2000), https://magazine.byu.edu/article/for-the-spirit-of-it-students-workers-at-the-mtc/, attached as **Exhibit F**.) "Since the MTC is part of BYU, BYU student applicants are given first preference in the selection of MTC teachers." (*Frequently Asked Questions*, Employment, Provo Missionary Training Center, https://provo.mtc.byu.edu/employment, attached as **Exhibit G**.)

**Ms. Markowski Works as an MTC Online Trainer at the MTC**

8.     Prior to her employment at the MTC, Ms. Markowski was trained as a missionary in the MTC and served a full-time mission for the Church in France. (*See Letters from France*, Sister Ashtin Markowski Mission Blog, and screenshots from Ms. Markowski's Facebook page, dated Jan. 21, 2021, attached as **Exhibit H**.)

9.     After returning from her mission, Ms. Markowski resumed her studies at BYU in the Fall of 2017, and also "worked as a trainer in the online teaching

center" (the "OTC") at the MTC beginning November 2017. (Markowski Academic Record Summary, attached as **Exhibit I**; Compl. ¶¶ 4-5.)

10.     The OTC Vision Statement in place during Ms. Markowski's employment encouraged OTC Trainers, including Ms. Markowski, to "[b]ecome master teachers who exemplify Christ by [b]uilding connection with others in a way that leads to simplified and personalized teaching," and [i]nvesting in each other's conversion in order to increase our diligence and patience." (*See* OTC Vision Statement, attached as **Exhibit J**.)

11.     OTC trainers, including Ms. Markowski, were expected to lead discussions (including study of the Bible, the Book of Mormon, and other religious sources and topics) with persons interested in learning more about the gospel of Jesus Christ and the Church. (*See* screenshot of goals for "Follow Jesus Christ" Facebook page, attached as **Exhibit K**; Template Messages for Online Teaching, attached as **Exhibit L**; and sample study guide documents for "online missionaries," attached as **Exhibit M**.)

12.     A Job Description for "Online Teaching Center Trainer" at the MTC as of March 26, 2019 (during Ms. Markowski's employment), demonstrates how totally immersed an OTC trainer is in the details of developing and training missionaries and in sharing the Church's message with interested persons:

> A part-time position designed to help facilitate the day-to-day operations of the Online Teaching Center. Incumbents will be directly involved with

6

training and supporting the referral process including both incoming traffic of interested persons and in-field coaching of full-time missionaries. Responsible for the quality of the referral process, including generation, distribution, contacting, teaching, coaching, and reporting.

(OTC Trainer Job Description dated March 26, 2019, attached as **Exhibit N**.)

13. "Responsibilities (Essential Functions)" of an OTC trainer included "Pilot new online engagement activities"; "Help test training materials for full-time missionaries at Online Teaching Centers worldwide"; "Help coach in-field Online Teaching Center missionaries on their responsibilities"; and "Help coach in-field missionaries on their responsibilities regarding the referral process." (*Id.*)

14. Ms. Markowski signed a "Student Employment Protocol," in which she agreed to abide by certain rules, including to "[a]dhere to BYU Honor Code, MTC Dress and Grooming Standards and maintain a Current Temple Recommend." (Student Employment Protocol dated November 6, 2017, attached as **Exhibit O**.)

15. A "temple recommend permits Latter-day Saint to enter one of the [Church's] temples. An adult member of the Church receives two interviews to receive a temple recommend—once by a member of their local bishopric, then by a member of their stake presidency (a regional leader)." To qualify for a temple recommend, members are asked questions about their faith in and testimony of God, Jesus Christ, the Holy Ghost, the Restoration of the gospel; sustaining of Church leaders; and obedience to certain laws and commandments. (*See Church Updates Temple Recommend Interview Questions*, Newsroom of The Church of Jesus Christ

7

of Latter-day Saints (Oct. 6, 2019), https://newsroom.churchofjesuschrist.org/

article/october-2019-general-conference-temple-recommend, attached as **Exhibit P**.)

16.     As part of her employment, Ms. Markowski also signed

"Stewardship" documents on February 18, 2020, and May 13, 2020. (*See*

document signed by Ms. Markowski on February 18, 2020, attached as **Exhibit Q**;

document signed by Ms. Markowski on May 13, 2020, attached as **Exhibit R**.) In

those documents, Ms. Markowski made the following commitments:

a)  "As an Online Teaching Center Trainer at the Missionary Training
    Center, I will invite all to come unto Christ and help missionaries to
    effectively do the same." (Exs. Q, R at 1.)

b)  "Teaching Excellence. Teach by the Spirit through personal
    worthiness, love, respect, preparation and purpose." (*Id.*)

c)  "I will prepare for 30 minutes prior to each assigned shift or coaching
    session. Preparation may include studying the Book of Mormon." (*Id.*)

d)  "I will conduct all activities and interactions with the purpose and
    vision outlined in Preach My Gospel chapter 1." (*Id.*)

e)  "Appearance and Demeanor. Provide an obedient example and a
    reverent atmosphere by maintaining missionary appearance and
    appropriate demeanor." (*Id.*)

f)  "Trainer. The trainer is accountable to help interested individuals
    closer to Christ and to help missionaries understand and apply their
    purpose. As directed by the Spirit, the trainer will [carry out her job
    responsibilities]." (Ex. R at 2.)

g)  "[E]ach position within the Provo Online Teaching Center" had
    stewardship and responsibilities "in helping both staff and
    missionaries in fulfilling their purpose [as stated in *Preach My
    Gospel*]." (*Id.*)

17.     In addition to the missionary purpose, the vision for a successful

missionary (and OTC trainer) outlined in Chapter 1 of *Preach My Gospel* includes:

    a)  "Feel the Spirit testify to people through you."

    b)  "Love people and desire their salvation."

    c)  "Obey with exactness."

    d)  "Live so that you can receive and know how to follow the Spirit, who
       will show you where to go, what to do, and what to say."

    e)  "Develop Christlike attributes."

    f)  "Work effectively every day, do your very best to bring souls to Christ,
       and seek earnestly to learn and improve."

    g)  "Help build up the Church . . . wherever you are assigned to work."

(Ex. D 11–12.)

18.     Ms. Markowski admits that her responsibilities included "training of

full-time missionaries who were passing through the MTC in the handling of

incoming online inquiries and traffic of persons interested in The Church of Jesus

Christ of Latter-day Saints" and "training of full-time missionaries who were

serving in the 'field.'" (Compl. ¶ 6.)

19.     OTC trainers, including Ms. Markowski, were tasked with (a) coaching

missionaries and mission leaders on how to teach the gospel to individuals online; and

(b) piloting Church programs for online referrals from those who were interested in

the Church or gospel topics. For example, during Fall 2019, OTC trainers were

assigned "coaching weeks" when they fulfilled missionary coaching duties and

9

participated directly in online teaching; and "pilot weeks" when they fulfilled duties related to piloting the Church's programs for responding to online referrals. (*See* Fall 2019 Logistics PowerPoint presentation 17–25, attached as **Exhibit S**.)

20.     During Ms. Markowski's employment, OTC Trainers were required to attend religious training meetings each week and were expected to devote at least three hours to preparatory activities, such as studying the scriptures. (*Id.* at 14, 25.)

21.     Ms. Markowski admits that she had "a role in carrying out The LDS Church's mission by training full-time missionaries on how to properly use social media so as to convey the Church's message." (Compl. ¶ 21(m).)

22.     In her employment, Ms. Markowski also directly taught individuals who were interested in the Church and the gospel of Jesus Christ. Specifically, Ms. Markowski responded to online referrals and social media posts from those who were interested in the Church's message. In those interactions, Ms. Markowski thought of herself as a "missionary." (*See* Slack profile and post, attached as **Exhibit T** ("The only reason I've stayed this long at the OTC is because I love the work I do—I love missionary work.").)

23.     One way that Ms. Markowski engaged with people who expressed interest in the Church's message was through an online chat system. Some

10

examples of her missionary activities through the Church's chat system are

attached as **Exhibit U** and included the following:[2]

a) "Can I ask if you feel like God does know you? . . . It can definitely be hard to feel His love at times." (Ex. U at 1.)

b) In response to an individual's request for a free Bible: "Is it okay if representatives from our Church drop it off to you?" (*Id.* at 2.)

c) "A covenant is a promise between us and God. We promise to keep the commandments and God promises to bless us. The first covenant we make in the church is baptism." (*Id.* at 5, Fr. trans.)

d) "Honestly, there are a lot of things that are unclear in the Bible due to all the different translations . . . . However, the doctrine and teachings are clarified through modern revelation. This is the reason why we have a prophet and apostles today who clarify and expound on teachings of the gospel." (*Id.* at 8.)

e) "We believe that, thanks to Jesus Christ, we are all saved! He has paid the price for all of us. However, we still need to keep the commandments and repent so we can continue to progress and become better people." (*Id.* at 9.)

f) "Sometimes answers to prayers take a while. They may not be instant like you want it to be, but Heavenly Father really does hear and answers you. We also believe in personal revelation for ourselves. Do you know how to receive personal revelation for yourself?" (*Id.* at 10.)

g) "Would you two be interested with meeting the missionaries in person in your area?" (*Id.*)

h) "I would love to talk with you about the Bible! . . . We believe, first and foremost, that God is our Heavenly Father and that He

---

[2] For purposes of privacy and security in these online interactions, Ms. Markowski was sometimes referred to as "Ashley" or other pseudonyms instead of "Ashtin." (*See, e.g.*, Ex. U at 9 (Ms. Markowski stating "I'm Ashtin" while her name was listed in the chat as "Ashley"); *id.* at 13 ("I just realized that my name changed here on chat, but my name is actually Ashtin!").)

love us. His Son, Jesus Christ, is at the center of His plan for us!"
(*Id.* at 11–12.)

i) "I would even love to follow up and share what each other has
learned to, if you are interested in that." (*Id.* at 13.)

24.     As part of her employment, Ms. Markowski also posted on official

Church social media pages (e.g., the Come Unto Christ Facebook page) and other

Christian social media pages (e.g., the Follow Jesus Christ Facebook page),

including teaching about and defending the Church and its teachings. Some

examples of Facebook posts and comments made as part of her employment are

attached as **Exhibit V**, and included the following:

a) "[T]he full name of the 'Mormon' church is the Church of Jesus Christ
of Latter-day Saints. It is a Christian church, right there in the name!
Jesus Christ is at the very center of this church's beliefs, including the
fact that He lived and died for all of us so we can be forgiven and
strengthened and find peace and happiness." (Ex. V at 2.)

b) In response to a comment about Mark 4:1–23: "Oh, the parable of the
sower! I like how it explains how it's important to receive the word
and act on it, just as a seed will grow in good soil. What stood out to
you from this chapter?" (*Id.* at 10.)

c) In reply to a response to Ms. Markowski's invitation to study the
bible: "[T]hese Bible studies are all free! We just want to help others
learn and talk about Christ so we can do so too." (*Id.* at 11.)

d) In response to a request to study the bible: "That's great! ☺ Here are
the topics we are currently offering: 1) Feeling closer to God, 2)
Purpose of Life, 3) Becoming a Better Person, and 4) Strengthening
Your Family. Would you be interested in studying any of those?" (*Id.*
at 13.)

e) In response to Facebook user's reference to Philippians 4:6: "'. . . in
every thing by prayer and supplication with thanksgiving let your

requests be made known unto God.' I love that. What does that mean to you?" (*Id.* at 6.)

f) "I love how God answers our prayers right when we need them! He knows and loves you, [Individual]! I hope you know that." (*Id.* at 16.)

g) "I will be praying for you, my brother." (*Id.* at 5.)

h) "I also love Mark 5:36, which says, 'Be not afraid, only believe.' I know it's a lot easier said than done, but I love that verse!" (*Id.* at 15.)

i) A post describing her personal experiences with anxiety and depression, including a picture of Jesus Christ and an invitation that "[i]f any of you also experience depression and anxiety, please direct message me! I would love to talk with you or help you find local Christians in your area that you could meet up with!" (*Id.* at 4.)

j) In response to a Facebook user's indication that she would soon be baptized into the Church: "That's awesome! Congratulations! Being baptized will bless your life so much." (*Id.* at 15.)

25.    As part of her employment, Ms. Markowski also acted as a moderator on the Church's Come Unto Christ Facebook page, and she had administrator access to communicate on behalf of the Church with other Facebook users on this page using the Facebook messenger feature. The following examples of missionary messages that Ms. Markowski sent using this feature are attached as **Exhibit W**.

a) In response to an individual requesting how to get in touch with the Church in her area: "I would love to help you out! Let me look up Bethlehem Town and see where the closest congregation is!" (Ex. W at 1 (providing address of chapel, and name and contact information of local leader).)

b) "This page is run by the Church of Jesus Christ of Latter-day Saints, which is a Christian church! We believe that Jesus Christ is our Savior and that God is our Heavenly Father and He loves us. We are here on this page to answer questions and help people feel closer to Christ." (*Id.* at 2.)

c) "This page is run by representatives from [the Church]. It's Christian too ☺ The church actually made this video for Easter of Christ that I would love to share with you! You can find it at this link. [Easter video link.]" (*Id.* at 3.)

d) "[W]henever I don't feel as close to God, I miss Him! My faith gives me hope and makes me happier. ☺" (*Id.* at 4.)

e) "We can enter the kingdom of God by accepting Christ as our Savior and keeping the commandments. This includes having faith, repenting, being baptized by the proper authority, and receiving the gift of the Holy Ghost. These things all help us improve our relationship with God." (*Id.* at 5.)

f) "Dear Heavenly Father, thank you for this chan[c]e that [Individual] and I have to study together. Please bless us With the Spirit so we can feel uplifted and learn new things. Please also bless our friends and families, especially during this crazy time with the coronavirus. Thank you for all the blessings you have given us. We pray that we may continue to see the good amidst everything that is happening. We love you and we say this prayer and the name of Jesus Christ, amen." (*Id.* at 6.)

g) "I'm not just blindly following a religion because of its leaders-believe me, if that were the case, I'd be gone by now. I'm here because I have faith, I pray and God lets me know that He is there and He loves me. I could never deny that! ☺" (*Id.* at 7.)

26.     Because of Ms. Markowski's prior service as a full-time missionary in France and the fact that she is fluent in French, she was tasked with proselyting to French-speaking prospective members, and with being a moderator on the Church's French Facebook page, www.facebook.com/VenezAuChrist. (Ex. U at 3-7; examples of Ms. Markowski's messages while moderating this page are attached as **Exhibit X**.)

27.     In these social media interactions, Ms. Markowski taught individuals about the Church and its teachings, studied the scriptures with them, prayed with

them, provided them with links to Church materials, and offered to pray for specific individuals. (*See, e.g.*, Ex. V at 4–6.)

28.    Ms. Markowski also corresponded with those interested in the Church using a Church-assigned email address: ashtin@missionary.org. (Ex. U at 6.)

**Ms. Markowski's EEOC Charge of Discrimination**

29.    Ms. Markowski's employment at the MTC was terminated on May 15, 2020. (Compl. ¶ 12.)

30.    On June 12, 2020, Ms. Markowski filed a Charge of Discrimination with the Utah Anti-Discrimination & Labor Division and the U.S. Equal Employment Opportunity Office ("EEOC"). (Charge of Discrimination dated June 12, 2020, attached as **Exhibit Y**.)

31.    Ms. Markowski's charge of discrimination did not include a retaliation claim. (*Id.*)

32.    On September 22, 2020, the EEOC dismissed Ms. Markowski's EEOC charge and issued a "right to sue" letter, which Ms. Markowski received on September 25, 2020. (U.S. Equal Employment Opportunity Commission, Dismissal and Notice of Rights, dated September 22, 2020, attached as **Exhibit Z**.)

**Ms. Markowski's Title IX Lawsuit In Oregon**

33.    On March 29, 2021, Ms. Markowski and several other individuals brought a putative class action lawsuit against the U.S. Department of Education in

the United States District Court for the District of Oregon, Case No. 6:21-cv-474,

seeking a declaration that Title IX's religious exemption for certain religious

educational institutions is unconstitutional.

34.     Attached as an exhibit to that complaint is a declaration from Ms.

Markowski, a copy of which is attached as **Exhibit AA**.

35.     In her declaration accompanying the Oregon lawsuit, Ms. Markowski

states: "I had an on-campus job at the Missionary Training Center where I trained

missionaries and taught people about our church online. I did this for two and a

half years." (Ex. AA ¶ 11.)

## ARGUMENT

Summary judgment is appropriate where "'there is no genuine issue as to

any material fact and . . . the moving party is entitled to a judgment as a matter of

law.'" *Weigel v. Broad*, 544 F.3d 1143, 1150–51 (10th Cir. 2008) (citing Fed. R.

Civ. P. 56(c)). If there is no genuine issue of material fact in dispute, then a court

must next determine whether the movant is entitled to judgment in its favor as a

matter of law. *See, e.g.*, *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Ms. Markowski asserts two claims under Title VII: (1) a claim of

discrimination on the basis of sex, and (2) a retaliation claim. Both claims fail as a

matter of law because the ministerial exception applies to Ms. Markowski's job as

a teacher and trainer of missionaries at the MTC. Ms. Markowski's retaliation

claim also fails because she did not exhaust her administrative remedies.

## I.  The Ministerial Exception Applies to Title VII Claims

The First Amendment provides that "Congress shall make no law respecting

an establishment of religion, or prohibiting the free exercise thereof." U.S. Const.

amend. I. "[I]mposing an unwanted minister . . . infringes the Free Exercise Clause,

which protects a religious group's right to shape its own faith and mission through

its appointments[,]. . . [and] violates the Establishment Clause, which prohibits

government involvement in such ecclesiastical decisions." *Hosanna-Tabor*, 565 U.S.

at 188–89. Thus, "[b]oth Religion Clauses bar the government from interfering with

the decision of a religious group to fire one of its ministers." *Id.* at 181.

The ministerial exception bars Title VII claims asserted by certain religious (or

"ministerial") employees against churches and sectarian schools (*see, e.g.*, *Hosanna-

Tabor*, 565 U.S. 171; *Our Lady of Guadalupe Sch.*, 140 S. Ct. 2049), and against

private universities with religious missions (*see, e.g.*, *Petruska v. Gannon Univ.*, 462

F.3d 294, 307 (3d Cir. 2006) (concluding that the ministerial exception applied to bar

an employee's Title VII claims against Gannon University, a private Catholic

university); *E.E.O.C. v. Cath. Univ. of Am.*, 83 F.3d 455, 464–65 (D.C. Cir. 1996)

(concluding that the ministerial exception applied to bar an employee's Title VII

claims against the Catholic University of America).

Courts examine an employee's "circumstances of . . . employment" to determine whether she is an exempt ministerial employee. *Hosanna-Tabor*, 565 U.S. at 190–91. There is no "rigid formula"; "a variety of factors may be important." *Our Lady of Guadalupe*, 140 S. Ct. at 2062–63. These factors may include: (1) the employee's job title; (2) the employee's required training; (3) the employee's own representations about her position; (4) the relevant church's view of the employee's position; and (5) the employee's job duties. *See, e.g.*, *Hosanna-Tabor*, 565 U.S. at 191–92 (examining the employee's title of minister, the employee's degree of religious training, the church's references to the employee as a minister, the employee's communications about her job, and the employee's job duties, which included teaching religion, praying with students, and giving devotionals); *Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1243–44 (10th Cir. 2010) (examining the employee's job duties, title, and communications about her role).

While a factor-by-factor analysis may be helpful in some cases, ultimately, "[w]hat matters, at bottom, is what an employee does." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. Thus, when an employee's job includes the performance of "vital religious duties," Title VII has no role in disputes with her employer, regardless of the employee's title or formal training. *Id.* at 2066; *see also id.* at 2064 (noting that factors including an employee's title or formal training "are not

18

inflexible requirements and may have far less significance in some cases"). And because "[r]eligious education is vital to many faiths practiced in the United States"—including the Church, which "has a long tradition of religious education" —employees who "[e]ducat[e] young people in their faith, inculcat[e] its teachings, and train[] them to live their faith," perform "vital religious duties" such that the ministerial exception applies to bar Title VII claims against those institutions. *Id.* at 2064, 2066.

## II.    The First Amendment Bars Ms. Markowski's Title VII Claims

BYU is entitled to judgment as a matter of law on Ms. Markowski's claims for at least two reasons. *First*, as an OTC trainer at the MTC, Ms. Markowski performed "vital religious duties" for the Church, including instructing and training young missionaries in how to share their faith, inviting missionaries-in-training to "come unto Christ," and proselytizing and witnessing her own faith to those interested in the Church and its teachings. That "serv[ice] as a messenger or teacher of [the] faith" is alone sufficient to bar Ms. Markowski's claims. *Id.* at 2064 (quoting *Hosanna-Tabor*, 565 U.S. at 199). *Second*, factors beyond Ms. Markowski's actual duties—including her title and training and the ways she and the Church described her work—confirm that, in any event, she was a "minister" for the Church such that the First Amendment precludes her claims.

### A.  Ms. Markowski Performed "Vital Religious Duties"

As discussed above, the most important inquiry in determining whether the ministerial exception bars an employee's discrimination claims is "what an employee does." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064. Ms. Markowski's actual duties—inviting all to "come unto Christ," teaching missionaries how to do the same, and proselytizing and testifying to prospective members of the Church—render her a "minister" under Supreme Court precedent.

As a teacher at the MTC—essentially the Church's theological seminary for missionaries—Ms. Markowski performed vital religious duties that reflected her role in conveying the Church's message and carrying out its mission. For example, the purpose of Ms. Markowski and her fellow OTC Trainers was to "[b]ecome master teachers who exemplify Christ." (Ex. J.) Ms. Markowski was to "[t]each by the Spirit through personal worthiness, love, respect, preparation and purpose." (Exs. Q, R.) She was expected to "help interested individuals [come] closer to Christ," and "help missionaries understand and apply their purpose," which is to invite people to come to Jesus Christ. (*Id.*) She trained missionaries about methods of fulfilling their "commission to teach the restored gospel of Jesus Christ." (Ex. D at 1.) Ms. Markowski's job included developing new training materials for missionaries, and piloting and training missionaries to use online teaching programs. (Ex. N.) Importantly, Ms. Markowski admits that she had "a role in carrying out [the]

Church's mission by training full-time missionaries on how to properly use social media so as to convey the Church's message." (Compl. ¶ 21(m).)

Ms. Markowski also directly represented the Church on chats, messages, posts, and comments on social media. (*See, e.g.*, Exs. U, V, W, X.) She was assigned to spend hours each week teaching those who were interested in learning more about the Church, its teachings and scripture. (*See* Ex. S at 14, 25; Exs. U, V, W, X.) In these online activities, she taught people about the gospel of Jesus Christ, defended the Church and its teachings, referred interested individuals to full-time missionaries, shared information about where to attend Church, prayed for and with people, studied the Bible and the Book of Mormon with individuals, and bore testimony about her faith—all as a representative of the Church.

In short, Ms. Markowski prepared missionaries and other individuals "for their participation in other religious activities" and "serve[d] as a messenger or teacher of [the] faith." *Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2064, 2066. These activities constitute the performance of "vital religious duties" and confirm that the First Amendment's Religion Clauses govern Ms. Markowski's employment relationship with BYU. *Id.* at 2066 (noting that "educating and forming students" in the faith is a vital religious duty in many churches and that "The Church of Jesus Christ of Latter-day Saints has a long tradition of religious education"). For this reason alone, Ms. Markowski's claims fail as a matter of law under the ministerial exception.

21

### B.      Ms. Markowski's Employment Satisfies Other Ministerial Factors

As discussed above, Ms. Markowski performed "vital religious duties" for the Church pursuant to her employment at the MTC. That conclusion is dispositive and should end the inquiry. In addition, other factors beyond her actual duties further confirm that the ministerial exception bars Ms. Markowski's claims. These additional factors may include, among others: (1) the employee's job title; (2) the employee's required training; (3) the employee's own representations about her position; and (4) the relevant church's view of the employee's position. *Hosanna-Tabor*, 565 U.S. at 191. Each of these supports the conclusion that Ms. Markowski was a minister.

First, consider Ms. Markowski's title, an "Online Teaching Center Trainer." Although it does not include the word "minister," Ms. Markowski's title, like the job title in *Skrzypczak*, shows that Ms. Markowski's position was important to the teaching mission of the Church. *See Skrzypczak*, 611 F.3d at 1244 (concluding that the employee's "title as the director of the Department of Religious Formation" indicated the employee's "importance to the spiritual and pastoral mission of church"). Indeed, as a "trainer," Ms. Markowski was responsible for instructing others, especially young missionaries, how to teach the gospel through online resources. (Ex. N.) The content and purpose of Ms. Markowski's teaching position was overtly religious. She went far beyond simply acting as an IT or administrative employee. Indeed, she was a teacher of the gospel who committed to "invite all to

come unto Christ and help missionaries to effectively do the same." (Exs. Q, R.)

Because "[t]he concept of a teacher of religion is loaded with religious significance,"

*Our Lady of Guadalupe Sch.*, 140 S. Ct. at 2067, Ms. Markowski's title as an

"Online *Teaching* Center Trainer" supports a finding that she was a minister.

Second, Ms. Markowski's training for her position also supports the

conclusion that she was a minister. Prior to her employment at the MTC, she had

served an eighteen-month full-time mission for the Church in France, where she

received MTC training followed by a real-world training on how to be an effective

missionary and share the gospel of Jesus Christ. That missionary service was a

prerequisite for her employment at the MTC. As an OTC Trainer, she also agreed

that she would spend thirty minutes before each of her shifts in spiritual

preparation, including through scripture study. (Exs. Q, R.) She also received

weekly religious instruction and training from her supervisors. Eighteen months of

religious teaching experience, required daily scripture study, and weekly religious

instruction in her duties are more religious training than the Supreme Court has

concluded is necessary to qualify as a minister. *See, e.g., Our Lady of Guadalupe*

*Sch.*, 140 S. Ct. at 2049, 2069 (applying the ministerial exception where one

plaintiff's "only training in religious pedagogy was a single half-day conference,"

and the other plaintiff "had no such [pedagogy] credentials when the school hired

her," *id.* at 2077 (Sotomayor, J., dissenting) (internal quotations marks and citation

23

omitted)). Further, by hiring Ms. Markowski to teach missionaries and prospective Church members, BYU necessarily concluded that Ms. Markowski "had a sufficient understanding of [Church doctrine] to teach" those individuals. *Id.* at 2068. "[J]udges have no warrant to second-guess that judgment or to impose their own credentialing requirements." *Id.*

Third, Ms. Markowski held herself out as a representative of the Church, authorized to teach Church doctrine. Routinely acting on behalf of the Church, she responded to chats on the Church's websites and posted messages and comments on Church social media pages. (*See, e.g.*, Exs. U, V, W, X.) As a representative of the Church, she offered to hold and did hold religious studies with those interested in the Church's message. (*See, e.g.*, Ex. V at 10 ("Would you like to schedule a Bible study [ ]?"); Ex. W at 6 (typing a prayer for an individual).) Ms. Markowski herself recognized that her role was to connect with and teach people online, and she viewed her work as missionary work for the Church. (*See* Ex. T at 2.) Notably, Ms. Markowski expressly admitted in a recent declaration that, in her employment as an OTC Trainer at the MTC, she "trained missionaries and taught people about our church online." (Ex. AA ¶ 11.) Like the employee in *Skrzypczak*, Ms. Markowski's statements show that she considered it part of her job to promote the Church's teachings. 611 F.3d at 1244.

Fourth, the Church views Online Teaching Center Trainers at the MTC as playing a vital role in teaching the gospel. The Church describes the MTC as a place where missionaries are taught "how to teach the gospel," where teachers provide a "rigorous curriculum" of "the gospel of Jesus Christ," and where the missionaries receive "intense gospel classroom instruction." (Ex. B.) The Stewardship Document begins with this statement: "As an Online Teaching Center Trainer at the Missionary Training Center, I will invite all to come unto Christ and help missionaries to effectively do the same." (Ex. Q at 1.) It also states that Online Teaching Center Trainers should act with the same missionary purpose as full-time missionaries, as described in *Preach My Gospel*, and that they should "help missionaries understand and apply their purpose." (*Id.*) Thus, the Church views missionary work as central to its purpose; it views the MTC as the critical place to teach missionaries the gospel (so they can go out and teach others); and it views Online Teaching Center Trainers as a vital element of both these missions. The Church has increasingly viewed social media as a critical tool for missionaries in sharing the gospel. *See* Tad Walch, *How LDS Missionaries Are Using Social Media To Reach an Evolving Audience*, Deseret News (Apr. 3, 2015), https://www.deseret.com/2015/4/3/20561945/, attached as **Exhibit BB**.

All these factors—Ms. Markowski's title, training, and view of her role, and the Church's view of Ms. Markowski's role—confirm that BYU employed Ms.

Markowski as a minister for the Church. The religious nature and importance of her religious duties were at least as great—and indeed far exceed—those at issue in *Hosanna-Tabor* and *Our Lady of Guadalupe*, where the Supreme Court applied the ministerial exception to bar the teachers' discrimination claims.

### III.   The Retaliation Claim Fails Because Ms. Markowski Did Not Allege Retaliation before the EEOC.

"[A] Title VII plaintiff [is required] to exhaust administrative remedies for each individual discriminatory or retaliatory act." *Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003). Failure to do so will result in dismissal of any claim for which administrative remedies before the EEOC were not exhausted. *See, e.g.*, *Glapion v. Jewell*, 673 F. App'x 803, 807 (10th Cir. 2016) (affirming dismissal of claim regarding improper processing of EEO complaint for failure to exhaust administrative remedies); *McDonald-Cuba v. Santa Fe Protective Servs., Inc.*, 644 F.3d 1096, 1101 (10th Cir. 2011) (instructing district court to dismiss retaliation claim for failure to exhaust administrative remedies).

In her Charge of Discrimination before the EEOC, Ms. Markowski did not reference "retaliation" or even check the box for retaliation as one of her allegations. (Ex. Y.) Accordingly, the EEOC did not reference retaliation in its Notice of Charge of Discrimination to BYU. As a result, BYU did not reference or have an opportunity address any allegations of retaliation in its response to the EEOC, and the EEOC never considered any such allegations. Accordingly, Ms.

Markowski failed to exhaust her administrative remedies with respect to her claim for retaliation, and that claim must be dismissed.

## CONCLUSION

The Church's Missionary Training Center is the equivalent of a theological seminary for Church missionaries. As a teacher at the MTC, Ms. Markowski "serve[d] as a messenger [and] teacher of its faith," "[e]ducat[ed] young people in their faith, inculcat[ed] its teachings, and train[ed] them to live their faith" by sharing those teachings with the world. *Our Lady of Guadalupe Sch.*, 140 S. Ct. 2052, 2063 (quoting *Hosanna-Tabor*, 565 U.S. at 199). These responsibilities "lie at the very core" of the Church's—and BYU's—mission. *Id.* at 2064. Accordingly, Ms. Markowski was a minister, and the First Amendment bars her claims. Judgment should be entered for BYU on all of Ms. Markowski's claims.

DATED: May 3, 2021

STOEL RIVES LLP

*/s/ David J. Jordan*
David J. Jordan
Jordan C. Hilton

BRIGHAM YOUNG UNIVERSITY

*/s/ David M. Andersen*
David M. Andersen
Madelyn L. Blanchard

*Attorneys for Defendant*
  *Brigham Young University*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2021, a full and correct copy of the foregoing **MOTION FOR SUMMARY JUDGMENT** was served upon all counsel of record via the Court's electronic filing system.

_/s/ Ann-Marie Liddell_